IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                           CR No. 09-60061-AA

       Plaintiff,                                   OPINION AND ORDER

  v.

RODNEY MEAD PELLING,

       Defendant.
_____

AIKEN, Chief Judge:

     Defendant is charged by indictment with five counts of
producing child pornography in violation of 18 U.S.C. § 2251(a),
four counts of receiving child pornography in violation of 18
U.S.C. § 2252A(a)(2), and one count of possessing child pornography
in violation of 18 U.S.C. § 2252A(a)(5)(B).  Defendant moves to
suppress evidence and statements obtained during and after an
encounter with law enforcement officers at a motel room during the
late evening of July 13, 2008.  On May 14, 2010, the court held an
evidentiary hearing and heard testimony from three witnesses,
including defendant.  The motion is denied.

1    - OPINION AND ORDER

BACKGROUND

On July 13, 2008, the Deschutes County Sheriff's Office (DCSO) received a call from the manager of the Best Western Ponderosa Lodge motel in Sisters, Oregon, informing them of suspicious activity between defendant and a 12-year girl (later identified as "NP," defendant's daughter). Defendant and NP were staying in Room 203 at the motel.

According to a motel employee, NP called the motel desk and asked that their room be cleaned. The employee noted that while the room had two beds, only one appeared to have been used. While in the room, the employee also saw a Playboy magazine and two "R" rated movies. One of the movies was "American Beauty," which the employee described as involving an older man having a sexual relationship with a teenage girl. The employee also reported seeing defendant and NP engaging in inappropriate sexual-type play in the motel swimming pool. The motel manager watched as defendant and NP returned to their motel room from the pool and observed NP standing on the balcony outside Room 203 wrapped in a towel. As the manager watched, NP took her bikini off, opened the front of the towel, and exposed herself to defendant inside the motel room.

When deputies first arrived in response to the motel manager's call, defendant and NP were not at the motel. DCSO Sergeant Gary Cima and Deputy Marcus Mendoza, both in uniform, returned at approximately 9:45 p.m. and knocked on the door to Room 203. A "Do

2    - OPINION AND ORDER

Not Disturb" sign was on the door handle.  After receiving no response, they knocked again. Shortly thereafter, defendant answered the door wearing nothing but a white towel around his waist.

The door to Room 203 was plainly visible from the parking lot, and Deputy Mendoza asked defendant if he would rather talk inside the motel room.  Defendant said "No" and pulled the door closed behind him. The deputies explained the reason for contacting defendant and described the information provided by the motel manager.  Defendant told them that NP was his daughter, and that she was just being "playful" at the pool and on the balcony.  While the deputies were talking with defendant, NP opened the motel room door and asked defendant if everything was "okay."  She wore a long red T-shirt and had a towel wrapped around her waist. Defendant told her everything was "fine" and to go back inside the room. Sgt. Cima asked if he could enter the room to speak with NP to confirm that she was okay and to look around.  Without hesitation, defendant opened the door and said, "Go right ahead."

Upon entering the motel room, Sgt. Cima noticed that the lighting was very subdued.  He tried to turn on a light fixture, but it did not work. NP told Sgt. Cima that defendant had turned off the lights to adjust the lighting in the room, though she did not answer when Sgt. Cima asked her why defendant did so. At that point, Sgt. Cima noticed sophisticated digital camera equipment in

3    - OPINION AND ORDER

plain view on the other bed in the room.  Also in plain view were adult DVDs, the "American Beauty" DVD case, a book containing erotic material, a Playboy magazine, adult lingerie, a jar of Vaseline on the night stand, and an instant message on defendant's laptop containing a vulgar phrase and photograph of a woman's buttocks.

When defendant and Deputy Mendoza entered the motel room, defendant appeared visibly concerned about Sgt. Cima's proximity to the camera equipment.  Sgt. Cima asked defendant about the adult DVDs, the Playboy magazine, the erotica book, and NP's conduct. Defendant raised his voice and said, "Look it buddy, I just love my daughter."  Sgt. Cima then asked to see the contents of defendant's camera.  Defendant commented that "maybe" he "should consult with an attorney" because he had "some concerns about" images in the camera.[1]  Before Sgt. Cima could respond, defendant turned on the camera and turned it around. Sgt. Cima could clearly see the camera's playback screen and saw a nude photograph of NP.  When Sgt. Cima asked to view the gallery of images in the camera, defendant said, "Look it man, it is all art, purely an art form,

---

[1]At some point, Sgt. Cima asked defendant to confirm his consent to search the motel room by signing a printed consent-to-search card.  Defendant read both sides of the card and signed it in Sgt. Cima's presence.  Defendant did not recall when he signed it, and Sgt. Cima testified that defendant signed it before he asked to view the contents of the camera.  Regardless, defendant testified that he showed the camera to Sgt. Cima, and I find that defendant did so voluntarily.

4    - OPINION AND ORDER

that is all it is."  When Sgt. Cima asked what he was referring to, defendant said, "the photos of [NP]."

Defendant handed the camera to Sgt. Cima, who scrolled through the images stored on the camera.  Sgt. Cima observed additional nude photographs of NP, ranging from full-body images to those focusing on her breasts and vagina.  Defendant told Sgt. Cima that the images were all created "around here," and repeated that it was "all an art form."  At one point, defendant asked if he was under arrest.   When Sgt. Cima asked why defendant would ask such a question, defendant said nothing.

Meanwhile, Deputy Mendoza spoke with NP. NP told him that defendant used to be a photographer and was trying to get back into photography. She acknowledged that defendant took photographs of her, including nude photographs, but admitted that her mother knew nothing of the nude photographs.

At around 10:30 p.m., Sgt. Cima asked if defendant would accompany the deputies to the DCSO office in Bend for further questioning.  Defendant asked what would happen to NP, and Sgt. Cima explained that she would accompany them as well.  Defendant agreed.  He rode uncuffed in the back seat of Sgt. Cima's patrol car, while NP rode uncuffed in the front seat. Defendant's motel room was secured, and another deputy remained at the motel while Deputy Mendoza drafted a search warrant affidavit.

Defendant and NP arrived at the sheriff's office shortly

5    - OPINION AND ORDER

before 11:00 p.m.  DCSO Det. Tim Hernandez contacted defendant and asked if he would be willing to talk.  Defendant agreed.  Det. Hernandez told defendant that the interview was being recorded and that he was not under arrest but nonetheless advised defendant of his *Miranda* rights.  Defendant said he had no questions about the rights read to him.

Defendant told Det. Hernandez that he had taken pictures of NP to create a portfolio of her as she was growing up.  Defendant admitted that he had not yet created the portfolio and had stored the digital images of NP on the camera's media card.  Defendant admitted taking photos of NP in various locations, including the motel room in Sisters.

At first, defendant denied taking any nude photos of NP or photos of her posing in lingerie. Eventually, he admitted taking nude photos of her, but he specifically denied taking any photos of her vagina and denied using the photos for sexual gratification. Defendant also admitted taking showers with NP but denied engaging in any sexual activity with her.

The interview lasted several hours, although there were breaks in the questioning.  At one point, defendant confirmed that he came to the sheriff's office of his own free will, and shortly afterward he asked for an attorney.  Though the questioning ceased, defendant continued talking with deputies about arrangements for NP, and they reminded him several times that he had asked for an attorney.

6    - OPINION AND ORDER

Defendant was taken into custody at the conclusion of the interview and released on bail on July 14, 2008. NP was placed in temporary foster care until her mother arrived.

On July 14, 2008, Deputy Mendoza sought, obtained, and executed a search warrant for defendant's person, vehicle, and motel room. Law enforcement officers seized defendant's digital camera equipment, the memory card containing the images of NP, his laptop computer, the adult DVDs, the "American Beauty" DVD case, the jar of Vaseline, and defendant's and NP's other personal belongings.

On July 15, 2008, based on information received from the DCSO, Oregon State Police (OSP) Det. Patti Rhodes applied for and obtained a search warrant for defendant's residence in Newberg. Officers seized additional digital camera equipment, computer equipment and data storage media, several day planners, bedding from NP's bed, and two books of photographs by a photographer who specializes in portraits of teenage girls, some of whom are depicted nude. Defendant was arrested on multiple state law counts of using a Child in a Display of Sexually Explicit Conduct.

On April 16, 2009, a federal grand jury returned an indictment charging defendant with five counts of producing child pornography, four counts of receiving child pornography, and one count of possessing child pornography.

In support of his motion to suppress, defendant argues that he

7    - OPINION AND ORDER

was unlawfully seized by the DCSO deputies at the motel room in Sisters, and that his consent to enter and search the motel room was coerced.  Defendant also contends that he was in custody from the moment he answered the door but was not advised of his *Miranda* rights until his interview at the sheriff's office.  Defendant does not challenge the facial validity of either search warrant or claim that either lacked probable cause.

DISCUSSION

A.  Initial Encounter with Defendant

Defendant argues that he was seized by Sgt. Cima and Deputy Menodoza when they questioned him outside his hotel room, because a reasonable person would not have felt free to leave in those circumstances.  The government responds that the initial encounter and questioning of defendant was consensual.  I agree.

A seizure occurs when a law enforcement officer restrains the liberty of a person by either physical force or a show of authority.  United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997).  However, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002).  Similarly, it is neither illegal nor an unconstitutional invasion of privacy "to walk up the steps and knock on the front door of any man's 'castle'

with the honest intent of asking questions of the occupant."
United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)
(citation omitted).

In this case, Sgt. Cima and Deputy Mendoza knocked on
defendant's motel room door and asked to speak with him, and
defendant opened the door and voluntarily stepped outside.
Defendant testified that he chose to step outside dressed in only
a towel, because he did not want to speak to the deputies in front
of his daughter. Defendant does not allege that the deputies used
coercion or otherwise restrained his liberty outside the motel
room, and neither deputy had a weapon drawn or made any display of
force. Defendant testified that the deputies were polite,
professional, and made no attempt to enter the room. In fact,
defendant stood with his back to the door while the deputies stood
in front of him, and defendant could have opened the door and
entered the room at any time.

In essence, the deputies knocked on defendant's motel room
door, and within public view, spoke with him in a polite,
conversational, and non-threatening manner. Cormier, 220 F.3d at
1110 (encounter in response to officer's knock on motel door was
consensual when officer never displayed weapon, did not employ
physical force or official authority, and no evidence suggested
that the defendant attempted to terminate the encounter); United
States v. Crapser, 472 F.3d 1141, 1146 (9th Cir. 2007) (accord);

9    - OPINION AND ORDER

cf. United States v. Washington, 387 F.3d 1060, 1068-69 (9th Cir. 2004) ("knock and talk" found to a seizure where the defendant was surrounded by five armed officers, subjected to pat-down search, repeatedly reminded of a previous arrest, impliedly threatened with arrest, and escorted twenty feet away from his room).  Thus, the deputies' conduct did not communicate to defendant "that he was not at liberty to ignore the police presence and go about his business."  Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal quotation marks and citation omitted).  Accordingly, I find that the initial encounter with defendant was consensual.

Even if the deputies' initial encounter with defendant could be deemed non-consensual, such restraint does not violate the Fourth Amendment if supported by a reasonable suspicion that the person is engaging or about to engage in illegal activity.  Florida v. Royer, 460 U.S. 491, 498 (1983); Crapser, 472 F.3d at 1147. "Reasonable suspicion is formed by '"specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) (quoting United States v. Michael R., 90 F.3d 340, 346 (9th Cir. 1996)).  "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" Id.

10   - OPINION AND ORDER

In this case, the deputies were told by motel employees that they had witnessed inappropriate sexual behavior on several occasions between defendant and an underage girl and had observed inappropriate sexual items in defendant's motel room.  Given the details of the reported observations, the deputies had reasonable suspicion to question defendant.  Further, under the circumstances, the "Do Not Disturb" sign on the door and defendant's appearance at the motel door clad in only a towel would serve to bolster a reasonable suspicion that a crime may be occurring.  Therefore, I find no Fourth Amendment violation resulting from the initial encounter with defendant.

B.  Entry into Defendant's Motel Room

Defendant also argues that he did not give the deputies consent to enter and search his motel room.  The government bears the burden to show the voluntariness of a defendant's consent, and that burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  United States v. Perez-Lopez, 348 F.3d 839, 846 (9th Cir. 2003) (citation omitted). In assessing the voluntariness of defendant's consent, five non-exclusive factors are relevant: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained."

11   - OPINION AND ORDER

Cormier, 220 F.3d at 1112; see also Chan-Jimenez, 125 F.3d at 1327.

Notably, Sgt. Cima did not display a show of force or issue promises or threats; he simply asked to enter defendant's motel room.  In response, defendant pushed open the door and gave his consent to enter the room.  At no time during the encounter did Sgt. Cima or Deputy Mendoza raise their voices, display their firearms, or make threats against defendant or his daughter. Crapser, 472 F.3d at 1146, 1149; Cormier, 220 F.3d at 1112.  Once Sgt. Cima entered the room, incriminating evidence was in plain view.  United States v. Cornejo, 598 F.2d 554, 556 (9th Cir. 1979). Further, defendant does not dispute the fact that he showed the images on his camera to Sgt. Cima, and under the totality of the circumstances I find that he did so voluntarily.  Therefore, I find that defendant voluntarily consented to the entry of his motel room and the search of his camera.

C.  Questioning of Defendant

Finally, defendant contends that his statements made at the motel room and during questioning at the sheriff's office were involuntary and the product of an unconstitutional custodial interrogation. For the reasons explained above, defendant's encounter with sheriff's deputies at his motel room was consensual, and his statements made at that time were voluntary.  Further, defendant voluntarily accompanied the deputies to the sheriff's office and consented to questioning.  Even if defendant was

detained at that point, deputies had probable cause to arrest defendant, and he clearly was advised of his *Miranda* rights prior to questioning.  Defendant nonetheless made additional statements until he invoked his right to counsel.  Therefore, I find no constitutional violation.

### CONCLUSION

Defendant's Motions to Suppress (docs. 48 and 49) are DENIED.

IT IS SO ORDERED.

Dated this  20  day of May, 2010.


                    /s/ Ann Aiken
                   Ann Aiken
         United States District Judge